1
2
3
4              **UNITED STATES DISTRICT COURT**
                    **DISTRICT OF NEVADA**
5
6
7
DAYTON VALLEY INVESTORS, LLC, a          )    2:08-CV-127-ECR-RJJ
8  Nevada limited liability company,      )
d/b/a/ LAKEMONT HOMES,                    )
9                                          )
        Plaintiff,                        )
10                                         )
vs.                                       )    **Amended Order**[1]
11                                         )
UNION PACIFIC RAILROAD COMPANY,           )
12                                         )
        Defendant.                        )
13                                         )
_____ )
14                                         )
UNION PACIFIC RAILROAD COMPANY,           )
15                                         )
        Counterclaimant,                  )
16                                         )
vs.                                        )
17                                         )
DAYTON VALLEY INVESTORS, LLC, a           )
18  Nevada limited liability company,     )
d/b/a/ LAKEMONT HOMES,                    )
19                                         )
        Counterdefendant                  )
20  _____ )
21
22      This diversity case involves a dispute over ownership of a
23  strip of land located in Lyon County, Nevada.  Plaintiff and
24  Counterdefendant Dayton Valley Investors, LLC ("Dayton Valley")
25  claims ownership of the disputed property in fee simple, acquired
26
27      _____
        [1]  This  Amended  Order  supercedes  our  Order  (#50),  filed  on
28  September 30, 2009.  Though our disposition of the motions at issue
    remains the same, we here revise and expand our discussion.

either by deed or, in the alternative, by adverse possession. Dayton Valley alleges that Defendant and Counterclaimant Union Pacific Railroad Company ("Union Pacific") owned only an easement in the disputed property, which it has since abandoned.  Union Pacific, however, also claims a fee interest the disputed property.  Both parties seek a declaratory judgment quieting title in the disputed property.  Union Pacific also seeks damages for trespass.

Now before the Court are Union Pacific's motion for partial summary judgment ("MPSJ") (#26), and Dayton Valley's counter-motion for summary judgment ("MSJ") (#37).[2]  Concurrently with its counter-motion for summary judgment (#37), Dayton Valley filed a motion (#36) requesting leave to exceed the page limit.[3]  Also pending is Union Pacific's motion to strike (#41), which seeks to strike Dayton Valley's counter-motion for summary judgment (#37) on the basis that it was not timely filed in accordance with the scheduling order (#21) for this case.  Dayton Valley has filed a counter-motion (#47) to amend the scheduling order.

These motions are ripe, and we now rule on them.

---

[2] Dayton Valley's motion is captioned as a counter-motion for partial summary judgment.  In the motion itself, however, Dayton Valley asserts that it is "entitled to summary judgment on all claims and counterclaims in this case."  (MSJ at 2 (#37).)  The motion is, therefore, more properly a motion for summary judgment, not partial summary judgment, and we shall refer to it as such.

[3] Union Pacific's motion (#25) to exceed the page limit has already been granted (#29) by the Magistrate Judge.

## I. Factual and Procedural Background

The disputed property is part of a 400 foot wide strip of land located in Section 17 of Township 16 North, Range 22 East ("Section 17") in Lyon County, Nevada.  This strip of land is identified as a separate parcel, "APN 016-361-11," by the Lyon County Assessor.  A golf course, the Dayton Valley Golf Course, encroaches on the southwest portion of the parcel, and a residential subdivision, Quail Ridge, encroaches on the northeast portion.  The remainder of APN 016-361-11, which is vacant land, constitutes the property at issue in this action.[4]

Dayton Valley's Complaint (#1) was filed on January 30, 2008. Dayton Valley alleges that Union Pacific's predecessor in interest, the Central Pacific Railway Company ("Central Pacific"), owned the disputed property, as well other land in Section 17, until July 12, 1927.  On that date, Central Pacific executed a deed conveying its interest in land located in Section 17 to a Mr. D.P. Randall, who is

---

[4] It is worth noting that the Lyon County Assessor's records relating to APN 016-361-11 are somewhat misleading.  The county's most recent parcel maps seem to indicate that the designation "016-361-11" refers only to the strip of vacant land, though earlier maps show the parcel extending into land encroached upon by the residential subdivision and golf course.  (See MPSJ (#26) Ex. 24.)  It appears that the earlier maps were more accurate depictions.  The notation of the parcel's acreage does not change over time, though the pictorial representation of it shrinks.  (Id.)  The Lyon County Assessor, Hugh Michael Glass, suggested in his deposition that the change in depiction was likely cosmetic in nature, meant to avoid "clutter[ing] up" the page, and instituted by an employee who did not understand parcel maps well.  (MPSJ (#26) Ex. 23 at 31.)  Mr. Glass stated that he would be working with his "mapping person" to ensure future iterations of the parcel's depiction are less misleading.  (Id.)

Union Pacific takes the position that it owned a fee interest in the entirety of APN 016-361-11, including those portions that have been encroached upon by the golf course and housing development. Nevertheless, the parties here each seek to quiet title only to that portion of APN 016-361-11 that remains vacant.

a predecessor in interest to Dayton Valley.  This deed contained certain language, which will be examined in more detail below, "excepting and reserving" from the conveyance a strip of land, part of which is the disputed property.  Dayton Valley alleges that this language reserved for Central Pacific an easement in the disputed property for use of the property as a railroad right of way.  This easement, Dayton Valley alleges, was formally abandoned by Central Pacific's successor, Southern Pacific Railroad, in 1934, terminating the easement and leaving Dayton Valley with an unencumbered fee interest in the disputed property.

In the alternative, Dayton Valley argues that its predecessors in interest acquired a fee interest in the disputed property through adverse possession.  Dayton Valley asserts that the adverse possession began in 1984, continuing through the present.[5]  Thus, Dayton Valley argues, any interest Union Pacific might otherwise have retained has been extinguished.

Union Pacific's Answer and Counterclaim (#10) was filed on April 8, 2008, and then amended (#15) on April 21, 2008.  Union Pacific interprets the language in the Randall Deed as reserving for Central Pacific an interest in fee simple, not an easement, in the disputed property.  This fee interest, Union Pacific argues, was never abandoned or otherwise alienated, and passed to Union Pacific

---

[5] Dayton Valley states in its counter-motion for summary judgment that "the occupation of its predecessors-in-interest have [sic] been continuous and uninterrupted since 1927," the date of the Randall Deed.  (MSJ at 29 (#37).)  This bald assertion, however, is unsupported by any evidence in our record relating to the activities in Section 17 of Dayton Valley's predecessors in interest prior to 1984.  Moreover, aside from this fleeting assertion, Dayton Valley's evidence and argument is focused on the period after 1984.

4

as the successor in interest to Central Pacific.  Additionally, Union Pacific argues Dayton Valley's adverse possession claim is defeated by Union Pacific's payment of certain taxes on the disputed property, and that moreover Dayton Valley has failed to establish the elements of adverse possession.  Further, Union Pacific seeks monetary damages for trespass against Dayton Valley arising from Dayton Valley's activities on the disputed property.

On November 4, 2008, Union Pacific filed its motion for partial summary judgment (#26).  Specifically, Union Pacific seeks summary judgment on Dayton Valley's claims, Union Pacific's counterclaim for declaratory judgment, as well as the issue of liability on its counterclaim for trespass.  Union Pacific does not seek summary judgment on the issue of damages arising from Dayton Valley's alleged trespass.  Dayton Valley opposed (#35) the motion (#26), and Union Pacific replied (#39).

On November 11, 2008, Dayton Valley, concurrently with its opposition (#35) to Union Pacific's motion (#26), filed a counter-motion for summary judgment (#37), as well as a motion (#36) requesting leave to exceed the page limit on its both its opposition (#35) and its counter-motion for summary judgment (#37).  Union Pacific did not oppose the motion (#36) to exceed the page limit; however, it did oppose (#42) the counter-motion for summary judgment (#37), and Dayton Valley replied (#45).

Additionally, Union Pacific has filed a motion to strike (#41) Dayton Valley's counter-motion for summary judgment (#37).  Union Pacific notes that the deadline for filing dispositive motions, to which the parties stipulated in the scheduling order (#21), was

1  November 5, 2008.  Thus, Union Pacific argues, Dayton Valley's

2  counter-motion for summary judgment (#37) was untimely and should be

3  stricken.  Dayton Valley opposed (#46) Union Pacific's motion to

4  strike (#41), and Union Pacific replied (#48).  Also, Dayton Valley

5  filed a counter-motion (#47) to amend the scheduling order (#21),

6  which Union Pacific has opposed (#49).

7

8  **II. Motion to Strike/Motion to Amend Scheduling Order[6]**

9      Dayton Valley filed its counter-motion for summary judgment

10 (#37) on November 19, 2008, fourteen days after the November 5,

11 2008, deadline for the filing of dispositive motions set by the

12 Scheduling Order (#21).  Union Pacific argues that the counter-

13 motion (#37) must therefore be stricken as untimely.  Dayton Valley

14 has moved (#47) to modify the scheduling order to "accommodate" the

15 late filing of its counter-motion (#37).

16     Union Pacific insists that "motions filed outside of the

17 deadlines established in a district court's scheduling order cannot

18 be considered on their merits."  (D.'s Motion to Strike at 4 (#41).)

19 We disagree.  The Court has "broad discretion in supervising the

20 pretrial phase of litigation," including the authority to determine

21 "the preclusive effect of a pretrial order."  Johnson v. Mammoth

22 Recreations, Inc., 975 F.2d 604, 607 (9th Cir. 1992) (quoting Miller

23 v. Safeco Title Ins. Co., 758 F.2d 364, 369 (9th Cir. 1985).  It is

24 not an abuse of discretion for a court to deny or strike a motion on

25 _____

26     [6] The other pending procedural motion — Dayton Valley's motion
   (#36) to exceed the page limit on its opposition (#35) and counter-
27 motion (#37) — was unopposed, and will be granted.

28                                6

1  the basis that it is untimely filed according to the timetable set
2  by the scheduling order.  Id. at 610.  Nevertheless, before the
3  final pretrial conference the scheduling order may be modified upon
4  a showing of "good cause and with the judge's consent."  FED. R. CIV.
5  P. 16(b)(4); see Johnson, 975 F.2d at 608 (noting that the deadlines
6  set by the scheduling order govern the action "unless modified by
7  the court").  Indeed, our Scheduling Order (#21) explicitly
8  contemplates the possibility of modification: "the date for filing
9  dispositive motions shall be no later than November 5, 2008, unless
10 the Court otherwise orders."  (Scheduling Order ¶ 4(f) (#21).)  We
11 turn, then, to the question of whether modification of the
12 scheduling order is appropriate.

13      The Rule 16 "good cause" inquiry "primarily considers the
14 diligence of the party seeking the amendment."  Johnson, 975 F.2d at
15 609.  Dayton Valley, however, has not attempted to show that the
16 pretrial schedule could not reasonably have been met despite its
17 diligence.  See id. (quoting advisory committee notes to Rule 16).
18 Rather, Dayton Valley asserts that it simply did not realize that it
19 was appropriate to move for summary judgment until after the
20 deadline: "Upon reviewing Union Pacific's timely filed motion for
21 summary judgment, it became apparent to Dayton Valley that there
22 truly are no material issues of fact in this case, and that rather
23 than wasting judicial resources with a trial it would be appropriate
24 to have this matter disposed of by summary judgment."  (P.'s Opp. at
25 2 (#46).)

26      We will here refrain from suggesting how best to characterize
27 such an approach to prosecuting a case; it is enough to note that

28                                    7

"diligent" would not be an apt description.  Normally, therefore, the Rule 16 inquiry would end, the scheduling order would not be modified, and the untimely motion would not be considered.  <u>See</u> <u>Johnson</u>, 975 F.2d at 609.

Here, however, Dayton Valley's belated motion for summary judgment hinges on questions of law that the Court must eventually address either prior to or in the course of trial.  Because resolution of these legal questions would decide many, if not all, of the disputed issues between the parties, summary judgment appears to present an appropriate and efficient method of reaching such a resolution.

The Federal Rules of Civil Procedure "should be construed and administered to secure just, speedy, and inexpensive determination of every action and proceeding."  FED. R. CIV. P. 1.  Where a court determines that it would be more efficient — not just for the parties but particularly for the court — to consider a belated motion for summary judgment rather than strike it, the Rule 16 "good cause" requirement does not stand in the way.  <u>See</u> <u>Eischeid v. Dover Constr., Inc.</u>, 217 F.R.D. 448, 455-56 (N.D. Iowa 2003) (so stating).  Indeed, to hold otherwise would "undermine the court's ability to control its docket," <u>Johnson</u>, 975 F.2d at 610, contrary to the purpose of Rule 16.

In short, we find that Dayton Valley's belated counter-motion for summary judgment (#37) presents certain legal issues that the Court must inevitably address, either prior to or in the course of trial.  In these limited circumstances, we conclude that there is "good cause" within the meaning of Rule 16(b) for extending the

8

deadline for dispositive motions to accommodate Dayton Valley's otherwise untimely counter-motion for summary judgment (#37).  We do not thereby "reward the indolent and the cavalier," <u>Johnson</u>, 975 F.2d at 610, but rather avoid any further waste of judicial resources that might otherwise result from Dayton Valley's lack of diligence.[7]


### III. Cross-Motions for Summary Judgment

The pending motions for summary judgment and partial summary judgment address several separate, but related, issues.  First, we must determine the respective interests of the parties in the disputed property.  Once that question is answered, we may turn to the second inquiry, Dayton Valley's alleged liability for trespass.

---

[7] Our decision to consider Dayton Valley's belated counter-motion for summary judgment (#37) is unrelated to its merits, which we consider below.  To turn the analysis of whether to extend a deadline into de facto consideration of an untimely motion would undermine the purpose of setting deadlines at all.  <u>See</u> <u>Eischeid</u>, 217 F.R.D. at 455 (so stating).  The legal issues raised in Dayton Valley's belated counter-motion, not the merits of Dayton Valley's arguments, provide the basis for our decision to extend the deadline here.

We acknowledge Union Pacific's argument that Dayton Valley may have delayed moving for summary judgment in an attempt to "gain an unfair advantage from the briefing schedule and to file an unauthorized sur-reply" in the form of its reply brief (#45).  (D.'s Opp. at 11 (#49).)  To the extent, however, that such may have been Dayton Valley's intent, its purpose has not been achieved.  Dayton Valley may have got the last word, so to speak, but the Court accords the last word no special deference.  On the contrary, issues raised for the first time in a reply brief will not ordinarily be considered by the court.  <u>See, e.g.</u>, <u>United States v. Boyce</u>, 148 F. Supp. 2d 1069, 1085 (S.D. Cal. 2001).  Thus, Union Pacific's proposed "sur sur-reply" (<u>see</u> D.'s Opp. at 8 n.1 (#49)) is unnecessary, and leave to file such a document is denied.

9

## A. Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where no material factual dispute exists.  N.W. Motorcycle Ass'n v. United States Dep't of Agric., 18 F.3d 1468, 1471 (9th Cir. 1994). The court must view the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir. 1996), and should award summary judgment where no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  Judgment as a matter of law is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party.  FED. R. CIV. P. 50(a).  Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted.  Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 116 S.Ct. 1261 (1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Although the parties may submit evidence in an inadmissible form - namely, depositions, admissions, interrogatory answers, and affidavits - only evidence which might be admissible at trial may be considered

10

by a trial court in ruling on a motion for summary judgment.  FED.
R. CIV. P. 56(c); Beyene v. Coleman Security Services, Inc., 854 F.2d
1179, 1181 (9th Cir. 1988).

In deciding whether to grant summary judgment, a court must
take three necessary steps: (1) it must determine whether a fact is
material; (2) it must determine whether there exists a genuine issue
for the trier of fact, as determined by the documents submitted to
the court; and (3) it must consider that evidence in light of the
appropriate standard of proof.  Anderson, 477 U.S. at 248.  Summary
judgment is not proper if material factual issues exist for trial.
B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir.
1999).  "As to materiality, only disputes over facts that might
affect the outcome of the suit under the governing law will properly
preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.
Disputes over irrelevant or unnecessary facts should not be
considered.  Id.  Where there is a complete failure of proof on an
essential element of the nonmoving party's case, all other facts
become immaterial, and the moving party is entitled to judgment as a
matter of law.  Celotex, 477 U.S. at 323.  Summary judgment is not a
disfavored procedural shortcut, but rather an integral part of the
federal rules as a whole.  Id.

**B. Analysis of Interests in the Disputed Property**

To determine the parties' present interests in the disputed
property, we must begin with an explication of the historical
background that gave rise to those interests.  Our discussion will
therefore begin in the 19th Century and trace the ownership of the
disputed property through to the present day.  For the reasons

11

stated below, we conclude that Union Pacific owns record title to the disputed property in fee simple, and Dayton Valley has not acquired title through adverse possession.

### 1. Legal-Historical Background

"Beginning in 1850, Congress passed a series of statutes granting public lands to private railroad companies to spur the construction of a cross-country railroad." Avista Corp. v. Wolfe, 549 F.3d 1239, 1242 (2008) (citing Great N. Ry. Co. v. United States, 315 U.S. 262, 273 & n.6 (1942)); see also Leo Sheep Co. v. United States, 440 U.S. 668, 670-77 (discussing the history of this period of railroad development).  One such statute, enacted on July 1, 1862, is "[a]n Act to aid in the Construction of a Railroad and Telegraph Line from the Missouri River to the Pacific Ocean, and to secure to the Government the Use of the same for Postal, Military, and Other Purposes," ("the Union Pacific Act").[8]  Act of July 1, 1862, 12 Stat. 489.  Section 1 of the Union Pacific Act created the Union Pacific Railroad Company.  Id. at 490.  Section 2 granted land for a right of way to the railroad constructing the transcontinental line extending "two hundred feet in width on each side of said railroad where it may pass over the public lands . . . ."  Id. at 491.  Section 3 granted the railroad alternate sections of public land along the railroad — five alternate sections per mile, within a

---

[8] The parties have referred to this Act variously as the "Pacific Railway Act" or the "1862 Act."  The Supreme Court, however, has referred to it as the "Union Pacific Act," in light of the circumstance that the Act created the Union Pacific Railroad Company, in addition to providing large land grants to it.  See Leo Sheep Co., 440 U.S. at 672 & n.6.  We shall follow the example of the Supreme Court.

12

limit of ten miles on each side of the railroad — to further subsidize construction.  Id. at 492.  In 1864, Congress amended the Union Pacific Act, among other things doubling the section 3 grant to ten alternate sections within twenty miles of the railroad.  Act of July 2, 1864, 13 Stat. 356, 358.

Grants of land pursuant to section 2 of the Union Pacific Act — rights of way for the rail line itself — gave the railroad companies title in the form of a "limited fee, made on implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted."  N. Pac. Ry. Co. v. Townsend, 190 U.S. 267, 271 (1903).  Thus, under Townsend, land granted to a railroad under section 2 would revert to the United States if the railroad stopped using the right of way for railroad purposes.  Id. at 271-72; see also Avista Corp. Inc. v. Wolfe, 549 F.3d 1239, 1242-43 (9th Cir. 2008) (discussing Townsend and later legislative developments relating to section 2 grants).

Grants of land pursuant to section 3 of the Union Pacific Act, however — the alternating sections of public land along the rail line and within a specified distance from it — were not given in limited fee.  Rather, a section 3 grant is simply a "gift of lands . . . without reservation of rights, except such as were specifically mentioned . . . ."  Mo., Kan., & Tex. Ry. Co. v. Kan. Pac. Ry. Co., 97 U.S. 491, 497 (1878); see also Burke v. S. Pac. R.R. Co., 234 U.S. 669, 689 (1914) (barring cases of fraud, the issuing of a patent by the federal government to the railroad company gives the latter "absolute title") (quoting Moore v. Smaw,

13

1  17 Cal. 199, 199 (1861)).[9]  Moreover, section 3 grants are

2  considered in praesenti, that is, the rights the patent gives to the

3  grantee only vest upon issuance of the patent, but once vested the

4  rights relate back as against other intervening claimants to the

5  date of the Union Pacific Act, July 1, 1862.  Mo., Kan., & Tex. Ry.

6  Co., 97 U.S. at 798; see also S. Pac. Transp. Co. v. Watt, 700 F.2d

7  550, 555 (9th Cir. 1983) (explaining the doctrine of in praesenti

8  grants).

9      The system of land grants provided by the Union Pacific Act and

10  other similar statutes fell out of favor by the 1870s: the

11  conclusion of the Civil War had removed the federal government's

12  most immediate concerns about national unity and the safety of the

13  United States' Pacific possessions, and the public's increasing

14  concerns about corruption and fraud culminated in the 1872 Credit

15  Mobilier scandal.  See Great N. Ry. Co., 315 U.S. at 273-74; United

16  States v. Union Pac. R.R. Co., 91 U.S. 72, 79-80 (1875).  In 1872,

17  the House of Representatives went so far as to adopt a resolution

18  condemning the policy of granting subsidies of public lands to

19  railroads and other corporations.  Cong. Globe, 42d Cong., 2d Sess.,

20  1585 (1872); see Great N. Ry. Co., 315 U.S. at 273-74.

21

22      [9] Dayton Valley's argument that "the Ninth Circuit Court of

23  Appeals does not limit the Supreme Court's ruling in Townsend to
   'Section 2 rights of way' but extends the ruling to 'the interests of

24  railroads in land granted by patent under the acts of Congress prior
   to 1871'" is without merit.  (See Reply at 7 (#45) (quoting Vieux v.

25  E. Bay Reg'l Park Dist., 906 F.2d 1330, 1332 (9th Cir. 1990)).)
   Dayton Valley misreads the holding of Vieux, which involved only

26  railroad rights of way granted under section 2, not section 3 grants
   of sections of public land.  To the extent any language in Vieux may

27  be read as Dayton Valley suggests, it would be inconsistent with the
   controlling United States Supreme Court precedent we cite here.

28                                    14

Congress would reform the system of land grants to railroads, though not to the extent suggested by the House resolution of 1872. The General Railroad Right of Way Act of 1875 ("the 1875 Act") provided for easements, rather than land grants, to be given to railroad companies for rights of way across public lands.  Act of March 3, 1875, 18 Stat. 482 (codified at 43 U.S.C. §§ 934-39).  The 1875 Act granted a right of way two hundred feet wide through public lands to any railroad company which, upon receiving the approval of the Secretary of the Interior, timely constructed a railroad.  Id. at 482-83.  The 1875 Act did not, however, repeal the Union Pacific Act and the large scale land grants associated with it — the 1875 Act merely used a different form of subsidy for encouraging the future construction of branch lines from the transcontinental railroad and otherwise expanding the United States' network of rail lines.

Pursuant to the 1875 Act, the Carson & Colorado Railroad Company constructed a branch line running from Churchill to Mound House, Nevada ("the Mound House line").  The Mound House line, completed in 1881, crossed Section 17, running down the center of what is now APN 016-361-11.  (See MPSJ (#26) Exs. 5, 6, 8-11.[10]) Ownership of the Mound House line, as well as the easement over which it traveled, passed in a series of transactions to Central Pacific.  (Id. Exs. 12, 13 & 15.)  The deed by which Central Pacific

---

[10] Dayton Valley's objection that this evidence is inadmissable on the basis of hearsay and therefore should not be considered by the Court (Reply at 11 (#45)) would be without merit even if it were not waived because it was not raised in Dayton Valley's opposition (#35) to Union Pacific's motion (#26).  See Fed. R. Civ. P. 803(6) and (8).

took ownership of the Mound House line is dated February 29, 1912. (Id. Ex. 15.)

As of 1881, Section 17 was public land.  On May 21, 1895, however, pursuant to section 3[11] of the Union Pacific Act as amended in 1864, President Grover Cleveland signed a patent granting, among other things, the northwest quarter of Section 17 to the Central Pacific Railroad Company.  (Id. Ex. 3.)  It is through this portion of Section 17 that the Mound House line ran.  (See id. Ex. 5.)  On July 29, 1899, the Central Pacific Railroad Company's interests in land granted pursuant to such patents were assigned to the Central Pacific Railway Company.  (Id. Ex. 14.)

The Central Pacific Railroad Company's initial title to the northwest quarter of Section 17, as well as the interest acquired by its successor, the Central Pacific Railway Company, was encumbered by the easement that the United States had granted for the purpose of constructing the Mound House line.  See Moore, 17 Cal. at 199 ("A patent of land from the United States passes to the patentee all the interest of the United States, whatever it may be . . . .").  As noted above, however, on February 29, 1912, the Central Pacific Railway Company acquired ownership of the Mound House line and the easement that had permitted the line to cross public lands.  "Under

_____

[11] Dayton Valley's argument that the patent might have been issued pursuant to section 2 of the Union Pacific Act, rather than section 3, is without merit.  (See Reply at 7 (#45).)  As noted above, Section 2 provided for grants of strips of land to be used as railroad rights of way.  This patent grants the railroad a quarter of a section of public land, not a strip of land.  The authority to make such grants comes from section 3 of the Union Pacific Act, not section 2.  The circumstance that the patent does not explicitly state which section of the Union Pacific Act authorizes the grant creates no ambiguity in this regard.

1  the doctrine of merger, when a single owner 'acquires present
2  possessory fee simple title to both the servient and dominant
3  tenements [of an easement], the easement merges into the fee . . .
4  and is terminated.'"   <u>Glenbrook Homeowners Ass'n v. Tahoe Reg'l</u>
5  <u>Planning Agency</u>, 425 F.3d 611, 618 (9th Cir. 2005) (quoting <u>Breliant</u>
6  <u>v. Preferred Equities Corp.</u>, 858 P.2d 1258, 1261 (Nev. 1993)).
7  Thus, as of February 29, 1912, Central Pacific held fee title to all
8  of the northwest quarter of Section 17, including the Mound House
9  line, unencumbered by any easement.

10     Central Pacific received a patent signed by President Woodrow
11  Wilson on November 9, 1915, for the remainder of Section 17.  (<u>See</u>
12  MPSJ (#26) Ex. 4.)  As with the 1895 patent, this patent was issued
13  pursuant to section 3 of the Union Pacific Act, as amended in 1864.
14  <u>Id.</u>  Once again, though the rights that Central Pacific acquired by
15  means of this patent vested only upon its issue, the rights relate
16  back as against other claimants to July 1, 1862.  The ownership
17  interest then held by Central Pacific in the entirety of Section 17
18  was not a limited fee, as Dayton Valley has argued — it was obtained
19  through two patents issued pursuant to section 3 of the Union
20  Pacific Act, not section 2.  Rather, after receiving the second
21  patent from the federal government, the Central Pacific Railway
22  Corporation held a fee simple ownership interest in the entirety of
23  Section 17.

24          <u>2. The Randall Deed</u>

25     On July 12, 1927, Central Pacific conveyed most of its
26  ownership interest in Section 17 to a Mr. D.P. Randall.  (MPSJ (#26)
27  Ex. 17.)  The deed by which this conveyance was performed ("the

28                                17

Randall Deed") contained the following language, which forms the
primary locus of dispute in this case:

> EXCEPTING AND RESERVING from the foregoing conveyance: A
> strip of land Four-Hundred (400) feet wide, lying equally on
> each side of each main-track, side-track, spur, switch and
> branch line of Central Pacific Railway Company as the same are
> now or may hereafter be, constructed upon, across or adjacent
> to said land.
> Provided that this conveyance is on and subject to the
> condition that [Randall], his heirs and assigns, shall erect
> and forever maintain, good and sufficient fences on both sides
> of said strip or strips of land, herein excepted or reserved
> for right of way for railroad tracks.

(Id.)  The disputed property in this case is a strip of land
described by the above-portion of the Randall Deed: it is 400 feet
wide, lying equally on each side of the former path through Section
17 of the Mound House line, which was operational and owned by
Central Pacific when the Randall Deed was executed.  (See MPSJ (#26)
Exs. 5, 6, 8-11.)  Union Pacific asserts that the quoted language of
the Randall Deed means that Central Pacific never conveyed its fee
interest in that strip of land to Mr. Randall and his successors,
including Dayton Valley.  Instead, a fee interest in the disputed
property remained vested in Central Pacific.  That interest then
passed from Central Pacific to Union Pacific via a series of
corporate mergers.  (Id. Exs. 18, 19, 20.)

Dayton Valley, however, asserts that the quoted language of the
Randall Deed "excepted and reserved" for Central Pacific only an
easement for use as a railroad right of way, not a fee interest.
The Mound House line was legally abandoned in 1934.  (Id. Ex. 16.)
Dayton Valley argues on that basis that Central Pacific's easement
interest in the disputed property was extinguished in 1934, leaving

18

1  Mr. Randall and his successors, including Dayton Valley, with an

2  unencumbered fee interest in Section 17.

3      Union Pacific has the better side of this argument.  Dayton

4  Valley is correct that under Nevada law[12] it is "never presumed"

5  that a railroad holds in fee land over which a railroad right of way

6  is constructed.  City Motel, Inc. v. Nevada ex rel. State Dep't of

7  Highways, 336 P.2d 375, 377 (Nev. 1959).  City Motel does not,

8  however, require us to conclude that the Randall Deed reserved only

9  an easement interest from the conveyance.  Rather, City Motel stands

10  for the proposition that "[i]t is the intent of the parties to [a

11  deed] which . . . must determine the nature and extent of the estate

12  conveyed."  Id.  In City Motel, the facts were "settled by written

13  stipulation," so the intent of the parties could be determined from

14  "the language of the deeds themselves."  Id.  In general, however,

15  the intent of parties to a deed is determined from "all the

16  circumstances surrounding the transaction."  Kartheiser v. Hawkins,

17  645 P.2d 967, 968 (Nev. 1982); see also Coppermines Co. v. Comins,

18  148 P. 349, 353 (Nev. 1915) (same).  "All the circumstances"

19  includes, but is not limited to, the language of the instrument.[13]

20  See Triplett v. David H. Fulstone Co., 849 P.2d 334, 335 (Nev. 1993)

21

22

23      [12] In diversity actions, federal courts apply substantive state
    law.  Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Nitco Holding
24  Corp. v. Boujikian, 491 F.3d 1086, 1089 (9th Cir. 2007).

25      [13] Dayton Valley's argument that summary judgment is inappropriate
    whenever the Court looks to evidence other than the language of the
26  deed lacks merit.  (See MSJ at 31 (#37).)  If the extrinsic evidence
    presented by a party is uncontradicted except by bare assertion or
27  speculation, no genuine material issue of fact exists so as to
    preclude summary judgment.  See Anderson, 477 U.S. at 248.

28                                    19

1 (noting that "an inadequate legal description of the land in a deed
2 may be remedied by extrinsic evidence").

3     Where language in a deed describing a conveyance "recites that
4 the interest being conveyed is a 'right of way' over land . . . the
5 law is well settled that the estate conveyed amounts to a mere
6 easement over that land." City Motel, 336 P.2d at 377.  The
7 granting clause of the Randall Deed, however, does not recite that
8 the interest being conveyed is a right of way; rather, it excepts
9 and reserves "a strip of land," the location of which is described
10 in reference to a rail line.  (MPSJ (#26) Ex. 17.)

11     The Randall Deed does mention the purpose for which that strip
12 of land was intended, namely, to serve as a right of way for a rail
13 line.  Id.  It does not do so, however, in the granting clause;
14 rather, the purpose is mentioned in language describing a condition
15 of the conveyance, requiring the grantee to maintain fencing around
16 any strip of land excepted and reserved from the conveyance.  Id.
17 This is a somewhat different situation from that faced by the Nevada
18 Supreme Court in City Motel, where the granting clause of the deed
19 was ambiguous.  City Motel, 336 P.2d at 378.  Given these different
20 circumstances, a different result is appropriate; here, it appears
21 that the intent of the parties was to "except and reserve" the strip
22 of land from the conveyance altogether, not to grant the entirety of
23 Section 17 in fee to Mr. Randall, reserving only an easement for
24 Central Pacific.  See, e.g., King County v. Rasmussen, 299 F.3d
25 1077, 1085-86 (9th Cir. 2002) (finding term "right of way" used in a
26 deed to describe a strip of land, rather than to qualify or limit

27

28                                    20

1  the interest expressly conveyed, does not indicate an intent to

2  grant an easement only).

3       Dayton Valley argues further that the exception to the Randall

4  Deed is phrased in a manner so vague as to render it invalid.  The

5  idea here is that the clause "as the same are now or may hereafter

6  be, constructed upon, across, or adjacent to said land" means that

7  "the four hundred foot wide strip could be floating anywhere within

8  Section 17."  (MSJ at 18 (#35) (citing Massetti v. Madera Canal &

9  Irrigation Co., 68 P.2d 260 (Cal. Ct. App. 1937)).)  Dayton Valley

10 even postulates that, under this clause of the deed, the grantor

11 "could end up taking the entirety of Section 17 back by simply

12 constructing tracks, spurs, switches, and branches throughout the

13 entirety of Section 17."  (Id. at 19.)

14      The absurdity of such a reading of the Randall Deed indicates

15 that it is likely not the interpretation contemplated by the parties

16 to it.  Though it is possible from a strictly grammatical standpoint

17 to read the Randall Deed as Dayton Valley proposes, the

18 circumstances surrounding the transaction indicate that this was not

19 the intended meaning.  Taking those circumstances into

20 consideration, there is no ambiguity about the intent of the parties

21 to the Randall Deed.  The strip of land in Section 17 excepted from

22 the conveyance is described in reference to the Mound House line as

23 it was constructed at the time of the Randall Deed.  The location of

24 that line is readily ascertainable — it was more readily

25 ascertainable before the tracks were torn up in 1934, but even now

26 there is sufficient evidence to determine their previous location,

27 running down the center of APN 016-361-11.  (See MPSJ (#26) Exs. 5,

28

1  6, 8-11.)  The parties to the Randall Deed contemplated the
2  possibility that the lines might be torn up and then later rebuilt
3  over the same strip of land, not the possibility of the railroad
4  "taking back" Section 17 through construction of a web of railroads
5  across it, as Dayton Valley imagines.  As such, even the California
6  authority cited by Dayton Valley does not require a finding that the
7  exception was void.  See Massetti, 68 P.2d at 265 (noting that where
8  the location and identification of the excepted portions of lands
9  conveyed are readily ascertainable as a result of previous use, the
10 exception is not void for uncertainty).

11     Finally, Dayton Valley asserts that a Nevada statute in effect
12 at the time of the Randall Deed prevented railroad companies from
13 acquiring fee title to property.  See Peterson v. City of Reno, 436
14 P.2d 417, 419-20 & n.2 (Nev. 1968) (discussing 1865 NEV. STAT. 427,
15 437-38).  This statute permitted a railroad company to "acquire,
16 purchase, and hold" real estate for the "construction or
17 maintenance" of railroad facilities, but provided that such real
18 estate would eventually revert to the previous owner if it ceased to
19 be used for railroad purposes, "effectively limit[ing] the
20 railroad's interest to that of an easement."  Id.  A state statute,
21 however, could not add such conditions on use to interests acquired
22 by railroad companies under section 3 of the Union Pacific Act;
23 Congress intended section 3 land grants to be "in fee simple subject
24 only to the condition that the railroad be constructed . . . ."
25 Citizens Comm. to Save Land Grant R.R.s v. Burlington N., Inc., 708
26 F.2d 1430, 1434-35 (1983).  Thus, this Nevada statute did not divest
27 Central Pacific of its fee interest in Section 17, nor did it place

28                                    22

1  any restrictions on Central Pacific's use of that property or its
2  right to alienate all or part of it.[14]

3       In short, under the terms of the Randall Deed, Central Pacific
4  retained its fee interest in the disputed property, not just an
5  easement interest or nothing at all, as Dayton Valley would have it.
6  Later, in 1958, Central Pacific was merged into the Southern Pacific
7  Company, which in 1969 was in turn merged into the Southern Pacific
8  Transportation Company.  (MPSJ (#26) Exs. 15, 18.)  Finally, in
9  1998, the Southern Pacific Transportation Company was merged into
10 Union Pacific.  (Id. Ex. 20.)  Thus, Union Pacific, as successor in
11 interest to Central Pacific through this series of mergers, has
12 record title in fee simple in the disputed property.  We now turn to
13 the question of whether Dayton Valley has acquired title in the
14 disputed property through adverse possession.

15            3. Adverse Possession

16      Adverse possession can be claimed under two separate sections
17 of the Nevada Revised Statutes: Nev. Rev. Stat. § 11.110 through
18 Nev. Rev. Stat. § 11.150 "allow a party to assert his possession
19 against a known claimant," while Nev. Rev. Stat. § 40.090 "allows a
20 party to assert his possession against all claimants known or
21 unknown."  Potts v. Vokits, 692 P.2d 1304, 1306 (Nev. 1985).  In
22 order to bind all claimants pursuant to Nev. Rev. Stat. § 40.090,
23 there are certain requirements set forth in Nev. Rev. Stat. § 40.100

24

25      [14] Moreover, under this Nevada statute, once property acquired by
26 a railroad company ceased to be used for railroad purposes, title
   reverted to the previous owner.  See 1865 Nev. Stat. 438.  Here,
27 therefore, if the statute applied, the disputed property would revert
   to the United States, not to Mr. Randall and his successors.

28                                    23

1  that must be met.  Id.  Here, those requirements have not been met,
2  so Dayton Valley's claim can only be against known claimants —
3  namely, Union Pacific — pursuant to Nev. Rev. Stat. § 11.110 through
4  Nev. Rev. Stat. § 11.150.

5                          a. Payment of Taxes

6       Under Nevada law, the payment of taxes on the property at issue
7  for a period of five years is an "absolute requirement" for
8  establishing title through adverse possession.  Id. (citing Nev. Rev.
9  Stat. § 11.150; Crumbaker v. Kelly, 601 P.2d 1199 (1979); Reno
10 Brewing Co. v. Packard, 103 P. 415 (1909)).  Union Pacific argues
11 that on this basis alone Dayton Valley's claim of adverse possession
12 must fail: it is undisputed that Union Pacific has paid taxes
13 assessed by the Lyon County Assessor against APN 016-361-11.  (MPSJ
14 (#26) Exs. 21, 22.)

15      Dayton Valley, however, has also been paying taxes levied on
16 the same piece of land; the Lyon County Assessor incorrectly treated
17 Union Pacific's interest in APN 016-361-11 as an easement and Dayton
18 Valley as owner of a fee interest in the property, collecting
19 payments from both.  (See MPSJ (#26) Ex. 23 at 93:16-25; MSJ (#37)
20 Exs. 20, 25.)  In circumstances of double taxation similar to this,
21 the Nevada Supreme Court has held that the prior or subsequent
22 payment of taxes by the legal owner "is of no consequence," so long
23 as the adverse claimant has had the land at issue assessed to it and
24 paid all the taxes levied as a result.  Zubieta v. Tarner, 351 P.2d
25 982, 984 (Nev. 1960) (citing Cavanaugh v. Jackson, 34 P. 509, 509-
26 510 (Cal. 1893)).  Thus, though Dayton Valley did not pay the taxes
27 assessed to and paid by Union Pacific for APN 016-361-11, Dayton

28                                    24

1  Valley has satisfied this requirement of an adverse possession

2  claim.

3                    b. Occupation and Possession

4       Under Nevada law, in order to acquire title through adverse

5  possession against a known claimant, the adverse claimant must

6  continuously occupy and possess the property for a period of five

7  years.   NEV. REV. STAT. §§ 11.110, 11.150; see also Potts, 692 P.2d

8  at 1306 (discussing elements of adverse possession claim); Triplett,

9  849 P.2d at 336 (occupation of the property must be "hostile,

10 actual, peaceable, open, notorious, continuous and interrupted" to

11 establish a claim of ownership by adverse possession) (quoting Sutro

12 Tunnel Co. v. Lipscomb, 720 P.2d 1204, 1207 (Nev. 1986)).   The

13 holder of legal title to property is presumed to be in possession of

14 the property, absent evidence to the contrary presented by the

15 adverse claimant.   NEV. REV. STAT. § 11.100.

16      The Nevada Revised Statutes provide two separate methods of

17 establishing such occupation and possession, depending on whether or

18 not the occupant's claim of title is "found[ed] upon a written

19 instrument as being a conveyance of the premises in

20 question . . . ."   See NEV. REV. STAT. §§ 11.110, 11.130.   Where the

21 claim is founded upon a written instrument — often referred to as a

22 claim under color of title — a claimant may rely on "occupation and

23 possession of the premises included in such instrument . . . or of

24 some part of such premises, under such claim . . . ."   NEV. REV.

25 STAT. § 11.110.   Where the claim is not founded upon a written

26 instrument, only "the premises so actually occupied, and no other,

27

28                                  25

1  shall be deemed to have been held adversely."  NEV. REV. STAT. §

2  11.130.

3      In other words, where an adverse claimant holds a deed, for

4  example, that purports to give the claimant title over the property

5  at issue, but which is void or voidable for some reason, the adverse

6  claimant may rely on occupation and possession of a part of the

7  property to acquire through adverse possession the entirety of the

8  "premises" described in the deed — this is sometimes referred to as

9  constructive possession.  Where the adverse claimant does not found

10 its claim on such a written instrument, only title to that portion

11 of the "premises" actually occupied may be acquired through adverse

12 possession.

13     Dayton Valley claims that the occupation and possession of the

14 disputed property by its predecessors began in 1984, when Davada

15 Development Corporation ("Davada") acquired Section 17, including

16 the disputed property, by way of a December 31, 1984, deed from

17 another of Mr. Randall's successors in interest.  (See MSJ at 29-30

18 (#37).)  It is Davada that began the development of the residential

19 subdivision and golf course that encroach on APN 016-361-11.  (See

20 id. Exs. 16, 24.)  Dayton Valley accurately states that Davada held

21 color of title over all of APN 016-361-11.  (Id. Ex. 16.)  Thus,

22 under Nev. Rev. Stat. § 11.110, Davada could have asserted

23 occupation and possession of the entirety of that parcel, even if it

24 only occupied a portion of it.

25     Before the expiration of the five-year statutory period for

26 adverse possession, however, Davada conveyed its interest in Section

27 17 to John Lawrence (Nevada), Inc. ("JLN"), by way of a deed dated

28

26

February 13, 1987.  (Id. Ex. 17.)   The Deed by which Davada conveyed to JNL its interest in Section 17 contained the following exception: "Excepting therefrom all that portion which lies within the ownership of Southern Pacific Railroad Co., as shown on and assessed by the Assessments Records of Lyon County." (Id.)  This exception could only reference APN 016-361-11.  There is evidence that both Davada and JLN believed the railroad to hold only an easement interest, as did the Lyon County Assessor.  (See MSJ (#37) Exs. 23, 24, 25.)  Regardless of their subjective beliefs, however, because of this exception, the deed by which JLN purported to hold title to Section 17 does not on its face convey to JLN any interest in APN 016-361-11.  JLN could not, therefore, have asserted any claim of adverse possession to the disputed property under color of title; an adverse claimant cannot claim color of title by deed beyond what the deed purports to convey.  See Fritts v. Ericson, 349 P.2d 1107, 1111 (Ariz. 1960); Sorensen v. Costa, 196 P.2d 900, 904 (Cal. 1948); Johns v. Scobie, 86 P.2d 820, 825 (Cal. 1939).  Rather, any adverse possession by JLN would have had to be accomplished through actual occupation and possession of the disputed property.  Nev. Rev. Stat. § 11.130.

Nevada law strictly limits the definition of "possessed and occupied" for purposes of adverse possession: only "[w]here it has been protected by a substantial enclosure" or "[w]here it has been usually cultivated or improved" may land be deemed possessed and occupied for purposes of adverse possession not under color of title.  Nev. Rev. Stat. § 11.140.  There is no evidence in our record that either of these standards were met by JLN; apparently, sometime

27

before 1999, some soil was removed from the disputed property for use in adjacent construction, leaving "a substantial hole in the ground," but there is no evidence of enclosure, cultivation or improvement of the disputed property.  (See MPSJ (#26) Ex. 34 at 63.)  Thus, JLN never acquired through adverse possession any portion of the disputed property, which it could have then passed on to its successors in interest.

On April 9, 1998, JLN conveyed its interest in Section 17 to Comlaw No. 445 Limited, a United Kingdom Corporation.  (MSJ (#37) Ex. 18.)  This deed omitted the exception contained in the deed from Davada to JLN.  (Id.)  Section 17 was then apparently subdivided, and "[b]etween January 8, 1999[,] and July 25, 2006," Dayton Valley "acquired and assembled subdivided portions of Section 17 by way of several deeds . . . ."  (See id. Ex. 19.)  The deeds acquired and assembled by Dayton Valley also do not contain the exception found in the JLN deed, relating to the railroad's interest in APN 016-361-11.  Thus, Dayton Valley properly may assert adverse possession of the disputed property under color of title.

The deeds acquired and assembled by Dayton Valley, however, do not purport to grant Dayton Valley title to the portion of APN 016-361-11 now used by the golf course or the residential subdivision.  (See MPSJ (#26) Exs. 10, 11.)  Dayton Valley's color of title, therefore, does not extend to encompass that land, which is now occupied and possessed by non-parties to this action (presumably, the residents of the subdivision and the owners of the golf course).  Further, there is no evidence in our record to suggest that any of Dayton Valley's predecessors ever had color of title in both the

28

disputed property and the remainder of APN 016-361-11 during the existence of the golf course or the residential subdivision for the five-year statutory period.  Thus, Dayton Valley also did not succeed to ownership of the disputed property as a result of constructive possession of the disputed property by one of its predecessors.

Dayton Valley theoretically could — at least with regard to the portions of the disputed property that it acquired more than five years ago — satisfy the elements of adverse possession by demonstrating its own occupation and possession of the disputed property for the statutory period.  The Nevada Revised Statutes provide a somewhat broader definition of occupation and possession of land for adverse possession claims asserted under color of title: in addition to "[w]here it has been usually cultivated or improved" and "[w]here it has been protected by a substantial enclosure," land may also may be deemed occupied and possessed "[w]here, though not enclosed, it has been used for the supply of fuel, or of fencing timber, for the purpose of husbandry; or for the use of pasturage, or for ordinary uses of the occupant," and "[w]here a known farm or single lot has been partly improved, the portion of such farm or lot that may have been left not cleared, or not enclosed according to the usual course and custom of the adjoining country, shall be deemed to have been occupied for the same length of time as the part improved and cultivated."  Nev. Rev. Stat. § 11.120.

There is no evidence, however, of Dayton Valley occupying or possessing of any part of the disputed property in a manner that would fall within even the somewhat broader definition of Nev. Rev.

Stat. § 11.120.  The only uses to which the disputed property has been put by Dayton Valley have been a certain amount of additional earth movement and the cutting of a temporary dirt "construction road" across the disputed property.  (<u>See</u> MPSJ (#26) Ex. 34.)  No evidence of permanent improvements or continuous use of the property appears in our record: to the contrary, representatives of Dayton Valley have testified that the disputed property remains vacant and undeveloped, except in the limited sense just mentioned.  (<u>Id.</u>)

Dayton Valley makes much of the various "development activities" that it conducted related to the disputed property: "[d]evelopment plans were created based upon [Dayton Valley and it predecessors'] claims of title to the property at issue, entitlements were obtained through the County based upon their claims of title."  (Reply at 14 (#45).)  These development activities may indeed demonstrate "that Dayton Valley, and its predecessors have acted at all times as if they owned the property." (<u>Id.</u>)  They do not demonstrate, however, Dayton Valley's acquisition of title in the disputed property through adverse possession under Nevada law.  Dayton Valley has not presented, nor have we discovered, any authority from Nevada or from other jurisdictions that would support the notion that such "development activities," accompanied by only occasional and impermanent use of the land itself, could suffice to support a claim of adverse possession.  The "development activities" constitute planning and preparing for use of the land in question, not possession and occupation of the land in the meaning of Nev. Rev. Stat. § 11.120.

30

1    In short, because we conclude that Dayton Valley has not

2 established that either it or its predecessors occupied and

3 possessed the disputed property for the statutory period, Dayton

4 Valley's adverse possession claim fails.  Union Pacific's motion for

5 partial summary judgment (#26) will therefore be granted in that

6 regard, and Dayton Valley's counter-motion for summary judgment

7 (#37) will be denied.

8    **C. Trespass**

9    Union Pacific seeks to hold Dayton Valley liable for trespass

10 on the basis of Dayton Valley's activities conducted on the disputed

11 property.  "To sustain a trespass action, a property right must be

12 shown to have been invaded."  Lied v. Clark County, 579 P.2d 171,

13 173-74 (Nev. 1978) (citing Rivers v. Burbank, 13 Nev. 398 (1878)).

14 We have concluded here that Union Pacific holds title to the

15 disputed property in fee simple, and Dayton Valley has not acquired

16 title to it through adverse possession.  It is undisputed that

17 Dayton Valley has engaged in activities on the disputed property

18 such as constructing a road and moving earth.  These unauthorized

19 activities constitute invasions of Union Pacific's property rights.

20 As such, we conclude that Union Pacific is entitled to summary

21 judgment in its favor on its counterclaim for trespass.  The amount

22 of damages flowing from Dayton Valley's trespass is a matter to be

23 determined at trial.

24

25    **IV. Conclusion**

26    Though Dayton Valley filed its counter-motion for summary

27 judgment (#37) after the deadline for dispositive motions, it is

28                              31

appropriate for us to decide it on the merits along with Union Pacific's timely motion for partial summary judgment (#26).  Dayton Valley's belated counter-motion (#37) presents certain legal issues that the court must inevitably address either prior to or in the course of trial.  The summary judgment procedure represents an appropriate and efficient means of doing so.

Union Pacific nevertheless prevails on the merits.  Union Pacific's predecessors in interest acquired a fee interest in Section 17, including the disputed property, through land grants authorized under section 3 of the Union Pacific Act of 1862, as amended in 1864.  The Randall Deed did not relinquish that fee interest in the disputed property to the grantee, leaving the grantor with only an easement interest that was later abandoned, as Dayton Valley claims.  Rather, the Randall Deed excepted and reserved from the conveyance of the remainder of Section 17 a fee interest in the land later designated APN 016-361-11, which eventually passed to Union Pacific.

Additionally, Dayton Valley has failed to demonstrate that it or its predecessors acquired title in the disputed property through adverse possession.  Though Davada had color of title in all of APN 016-361-11, including the disputed property, it did not establish either actual or constructive possession of the disputed property for the statutory period.  JLN lacked color of title over the disputed property, and failed to establish actual possession of it. Dayton Valley has color of title in the disputed property, but its color of title does not extend to the remainder of APN 016-361-11. Nor is there evidence that any of Dayton Valley's predecessors

acquired title to the disputed property through adverse possession
under color of title extending to the entirety of APN 016-361-11.
Hence, Dayton Valley derives no benefit for its adverse possession
claim to the disputed property from the presence of the golf course
and residential subdivision on the remainder of APN 016-361-11.
Further, Dayton Valley has failed to demonstrate that it has
occupied and possessed the disputed property in the meaning of Nev.
Rev. Stat. § 11.120.

Finally, we conclude as a matter of law that Dayton Valley is
liable in trespass for its activities on the disputed property,
which constitute invasions of Union Pacific's property rights.  The
amount of damages flowing from that trespass remain to be determined
at trial.

**IT IS, THEREFORE, HEREBY ORDERED** that Union Pacific's motion to
strike (#41) is **DENIED**.

**IT IS FURTHER ORDERED** that Dayton Valley's counter-motion (#47)
to amend the scheduling order is **GRANTED** on the following basis:
Dayton Valley's belated counter-motion for summary judgment (#37)
will be treated as timely and addressed on the merits.

**IT IS FURTHER ORDERED** that Dayton Valley's motion (#36) to
exceed the page limit on its opposition (#35) and counter-motion for
summary judgment (#37) is **GRANTED**.

33

1        **IT IS FURTHER ORDERED** that Union Pacific's motion for partial

2   summary judgment (#26) is **GRANTED**.

3

4        **IT IS FURTHER ORDERED** that Dayton Valley's counter-motion for

5   summary judgment (#37) is **DENIED**.

6

7

8   DATED: October __6__, 2009.

9

10

11                                       _____
                                         UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                      34